Leibensperger, Edward P., J.
In this action, plaintiff Deborah J. Scott (“Scott”) seeks recovery of money lost in a fraudulent investment scheme. Defendant Mage, LLC (“Mage”) employed the individual responsible for the fraud, Stephen Hochberg. Defendants Jeffrey S. Davis and Jonathan Freedman were and are members and officers of Mage. Defendants move for summary judgment on all counts. For the following reasons, defendants’ motion is ALLOWED in part and DENIED in part.
BACKGROUND
The following facts are drawn from the summary judgment record, including the parties’ Consolidated Statement of Facts (“SOF”). Many of the SOF are disputed, in whole or in part. The court views the facts and the reasonable inferences from the facts in the light most favorable to the non-moving party, Scott.
Scott was the founder and 100% owner of Fabric Editions, Ltd. (“Fabric Editions”), a close corporation that produced custom fabrics and accessories. Scott’s husband, Robert K. Scott (“Robert Scott”), was Secretary and Treasurer of Fabric Editions. Mage was a consulting firm that provided a range of business advice to its clients. Among the “financial services” it offered were merger and acquisition advice as well as “strategic financial management.” Davis and Freedman were officers and managing members of Mage. During the period at issue here, Hochberg was the third managing member of Mage. He served as Mage’s CEO from 2002 until his termination from the company in August 2007.
I. Mage and Hochberg
Hochberg joined Mage on January 2, 1999. Prior to Hochberg joining the company, Mage was wholly owned by Davis. Freedman joined Mage one year after Hochberg, on Jan. 2, 2000. Hochberg was recruited into Mage by Davis. On Mage’s website, Davis announced that Hochberg would lead the firm’s financial services group “to provide comprehensive financial advisory services to clients.” Although Mage did not hold itself out as an investment advisory firm, the three principals of Mage invested, along with some of Mage’s clients, in other clients. On September 19, 2002, Davis announced the promotion of Hochberg to the position of chief executive officer of Mage. Davis remained as “founder and chairman.”
Mage, Davis and Freedman became aware of complaints by clients and/or investors about Hochberg. In 2001, Mage and Davis learned about a lawsuit against Hochberg concerning a business deal. The plaintiff, Douglas Schwartz, called Davis to say he was disappointed in Hochberg and that Hochberg owed him money. Davis was concerned about the claim and spoke to Hochberg. Subsequently, Davis was told by Hochberg that the matter was settled. Davis did not take steps to learn the details of the claim. In 2004, Mage received a demand letter from Dennis McGurk. McGurk alleged that Hochberg and Mage breached their fiduciary duties by failing to provide proper documentation concerning an investment and failing to disclose personal financial interests in several investments that Hochberg had advised McGurk to make. McGurk also alleged that on January 11, 2000, he made several investments of substantial money “through Mage, LLC” and by wiring funds to Mage, LLC. Davis and Freedman became aware of the McGurk claims. The McGurk claims were settled by Hochberg making a payment to McGurk. In March 2004, Mage received another letter complaining about a transaction between Hochberg and Hilton Schwartz, another client of Mage. Schwartz asked Davis for help in getting information about an investment he made with Hochberg. In the course of communications, Davis learned that Hilton Schwartz believed he had invested $150,000 in a “Mage Pool Account.” Davis *63 was concerned because a Mage Pool Account did not exist.
Another client, Peter Scott (no relation to plaintiff), sent, through his lawyer, a demand letter to Mage on July 15, 2005. Scott alleged that Hochberg had solicited Scott to make several loan investments. Scott further alleged that Hochberg had made various misrepresentations regarding the facts of the investments and failed to disclose his personal investment in the borrowing entities. The loans were in default and Scott asserted that Mage was responsible under G.L.c. 93A for up to $300,000. Davis, Freedman and Hochberg discussed the letter and engaged counsel. On October 5, 2005, Scott filed suit.
Following the Peter Scott complaint, Davis informed Hochberg that “it was unacceptable that he was involved in any way with clients outside of the normal business activity of Mage.” Davis, Freedman and Mage did not, however, take any steps to monitor Hochberg or to warn Mage clients about the risks of investing with Hochberg.
Subsequently, Mage, Davis and Freedman became aware of additional solicitations by Hochberg to clients to make investments, despite their previous admonitions. In August 2007, defendants learned of earlier investments and loans by client Alan Bressler. Davis had confronted Hochberg a couple of years before August 2007 about deals with Bressler and had been assured that nothing was going on. Davis had conversations with Bressler’s daughter sometime before July 2005 about Bressler’s investments with Hochberg. In June 2007, defendants learned that another client had invested in a real estate transaction with Hochberg, that he was promised the money back upon demand, and that Hochberg had not made good on that demand.
Defendants became aware of financial irregularities by Hochberg within Mage and took steps to protect the firm. A client fund account was held by Mage in a bank to be used for merger and acquisition transactions. Escrow amounts were to be held in the account on behalf of clients. Originally, Davis, Freedman and Hochberg were all signatories on the account. In 2001 or 2002, Mage became aware of deposits and withdrawals in the account that were unrelated to a pending M&A transaction and of which Davis and Freedman were unaware. A reasonable inference is that Davis and Freedman discovered that Hochberg was misusing the account. Davis and Freedman removed Hochberg as a signatory on the account and closed the account. Following the incident, Davis and Freedman removed Hochberg as a signatory on all of Mage’s bank accounts. Davis, who had loaned Hochberg approximately $11,000, was concerned that Hochberg was living beyond his means. Davis and Freedman also were aware that Hochberg used the company credit card for personal expenditures. At times, the misuse was “exorbitant” to the level of $10,000 to $15,000 in a month. Hochberg was confronted by Davis but continued to misuse the credit card. A cap on the use of the credit card was instituted by Davis and Freedman.
On August 2, 2007, Davis wrote to Hochberg expressing concerns about the panoply of complaints from clients and private deals. Davis stated that “I need to know that you have not put Mage in jeopardy with anyone for something we are not a party to, is against our policies, or have not authorized. Both Jon and I need to meet with you face to face as we need full disclosure of every person and company that has or had a relationship with Mage for [sic] that you asked for money and done deals with. We also need a complete current status on each.” The record does not reflect any response from Hochberg. Mage terminated Hochberg’s employment at Mage on August 17, 2007. Throughout the entire period of time, from 2001 to 2007, Davis, Freedman and Mage took no steps to inform clients about their concerns with Hochberg or to warn clients about investing with Hochberg.
II. The Scotts and Mage
At some time prior to December 2002, Scott, along with her husband, Robert Scott, decided to sell Fabric Editions. They received a referral from an accounting firm to contact Davis at Mage. Robert Scott initiated the contact. Davis and Hochberg traveled to the Scotts’ place of business in Greenville, South Carolina. Following that meeting an engagement was commenced. An engagement letter, dated December 20, 2002, was sent.
The engagement letter on Mage letterhead is addressed to both Robert and Deborah Scott at Fabric Editions, with the salutation, “Dear Bob and Debbie.” The first two pages of the letter reference the “consulting arrangement” agreed to and the “assignment” to review the company including a look at customers, products, suppliers and competition. ‘This process will lead us down two paths simultaneously as we will be working to develop and position the company to have it ready for sale and at the same time create the building blocks to go to market to sell the company.” This description of general consulting also included services directly to the Scotts: “We will also spend time to coach you through the next phase of your careers and lives.”
On page three of the letter there is a heading in all capital letters “MAGE MERGERS AND ACQUISITIONS ADVISORY AGREEMENT.” Following that heading is a statement of terms and conditions between Mage and Fabric Editions for Mage to act as exclusive agent to assist in the sale of Fabric Editions. The fee for the exclusive appointment included $10,000 as a monthly retainer and a success fee contingent on the closing of a sale. On the last page of the letter, the following appears: “M&A AGREEMENT ACCEPTED AND AGREED TO AS OF Jan. 3, 2003. FABRIC EDITIONS, LTD by Robert K. Scott, Sec./Treas.” Robert Scott’s *64 signature appears with the suffix “Sec./Treas.” Hochberg signed the letter as CEO of Mage. The letter closes with “(w]e look forward to helping you move into the next phase of your lives.”
Over the next two and a half years the arrangement between Mage and the Scotts and Fabric Editions continued. Hochberg served as the principal point of contact between Mage and the Scotts. Hochberg and Mage acted on behalf of and worked closely with the Scotts to, among other things, prepare Fabric Editions for sale, solicit potential buyers and advise the Scotts throughout the sale of the company. Early on in the engagement, Davis provided executive coaching to Scott. The Scotts only met Freedman once before engaging Mage and the record suggests that they had little, if any, contact with him thereafter.
Finally, in October 2005, Fabric Editions was sold. On November 2, 2005, immediately following the sale of Fabric Editions, Hochberg sent an email as CEO of Mage to the Scotts in which he said “(d]on’t look at my job being done — we have a lot of money on the table ...” The sale of Fabric Editions was for $4.5 million, plus the potential to earn $4 million more depending on the results of the acquiring company. The agreement included continued employment at the new company for Scott and a seat on the board of directors of the acquiring company for Robert Scott. Mage, through Hochberg, continued to advise the Scotts after the sale on a number of matters including issues regarding the potential earn out. According to Scott, Davis and Freedman were fully aware of this ongoing relationship between the Scotts and Mage.
From the outset of their relationship, Hochberg and Mage had encouraged the Scotts to continue to rely upon them even after the sale of Fabric Editions (e.g., we will “coach you through this next phase of your careers and lives”). In addition, from the emails in the record exchanged between Hochberg, as CEO of Mage, and the Scotts in the 2005-2006 period, it is evident that social and personal ties were established. Scott testified that in November 2005, she and her husband had “trust and faith” in Hochberg and Mage with respect to guiding their business and extending their interests into investments such as Really Funding.
III. Hochberg Solicits the Scotts
In November 2005, Hochberg solicited the Scotts to invest in a real estate venture. Hochberg called the venture Realty Funding, LLC. On November 9, 2005, Hochberg, over his electronic signature as CEO of Mage, told the Scotts by email that the real estate deal “will be going down in the next week or so — 8% return quarterly — anywhere from $100,000 to $250,000 available.” On November 23, 2005, Hochberg again emailed, over his signature block as CEO of Mage, to encourage the Scotts to invest. In this email, Hochberg stated that the investment will be paying 8.25% quarterly. Hochberg then stated the following: “I run this myself (nothing to do with Mage — I started it before Mage) — mostly long-time clients of mine who have put in money. Been doing it for 9 years — we pay out interest quarterly — a lot of people use it to plan their cash flow.”
The Scotts accepted Hochberg’s offer on November 28, 2005. Hochberg emailed (over his Mage electronic signature showing Mage’s address in Needham, MA) to Robert Scott on that date and gave him wire transfer instructions. Scott was to wire $250,000 to “Realty Funding” at an account at Bank of America. The address of Realty Funding was 60 Camperdown Lane, Sudbury, MA. In her deposition, Scott testified that she knew on November 28, 2005, that Hochberg lived in Sudbury, MA.
Robert Scott instructed an advisor to wire the $250,000 per Hochberg’s instructions “from my Trust Account.” According to Scott, upon Robert Scott’s death in June 2006, the Robert K. Scott Trust transferred the interest in Realty Funding to the Deborah J. Scott Marital Trust, which then transferred the interest to Scott, individually. Those. transfers occurred in March 2008.
IV. The Scotts’ Experience with Hochberg After the Investment in Realty Funding
Before investing in Realty Funding the Scotts did not consult with their long-time financial advisor, Victor Alibrandi, or their accountant, Jay Lind. The Scotts made the investment without seeing any documentation, beyond Hochberg’s emails, regarding Realty Funding or the expected use of the funds. There was no prospectus or even a document verifying the existence of Realty Funding. The Scotts understood from Hochberg that the annual rate of return on the $250,000 investment would be a fixed 8% per annum, guaranteed. The Scotts noted that Hochberg’s second email regarding the investment described the rate of return as 8.25% and this seemed peculiar to the Scotts to the point they questioned it. Nevertheless, they went forward with the investment.
The Scotts understood that Hochberg would distribute a quarterly check to them from the Realty Funding investment. The check was to issue shortly after the quarter closed. On May 2, 2006, in a chatty-email to Hochberg asking him to socialize when the Scotts traveled to Boston, Scott asked about the check for the first quarter of 2006. Hochberg immediately responded by saying that he had been traveling and that he would be cutting the checks tomorrow. He also accepted the Scotts’ invitation for dinner in Boston. The dinner in Boston occurred and Scott, in an email of May 24, 2006, expressed how she and Robert appreciated the guidance that Hochberg gave them. Apparently, Hochberg presented the Scotts with a distribution check from Realty Funding for the first quarter of 2006, but the check was lost by the Scotts following the dinner meeting. The May 24, 2006 email contained a request for a replacement distribution check and referenced continued connection to Mage *65 as the Scotts were also awaiting a check from Mage based upon a purchase price adjustment with regard to Fabric Editions. Finally, Scott asked Hochberg for “documents supporting the $250,000 that was invested in the real estate fund.”
When Robert Scott died in early June 2006, Scott re-sent her May 24, 2006 email on June 15, 2006. Over the next week, more emails were exchanged regarding Scott’s request for documentation of the investment. Scott was meeting with her lawyer, Robert Kunes, regarding Robert Scott’s will and investments. On June 20, 2006, Kunes wrote to Hochberg requesting that Robert Scott’s investment in Really Funding, LLC be titled “Robert K. Scott Trust u/a/d June 1, 2004, Deborah J. Scott Trustee.” As of July 25, 2006, Hochberg had not sent Scott a replacement check for the first quarter of 2006 and had not sent a distribution check for the second quarter of 2006. On August 22, 2006, Scott received a quarterly distribution check for at least one of the earlier quarters in 2006, but not for both. Also, by that date she had not received any formal documentation concerning Realty Funding, including an ownership certificate, operating agreement or any document verifying the existence of Really Funding.
On October 9,2006, Hochberg and Scott exchanged emails. Hochberg’s emails, over his electronic signature as CEO of Mage, confirmed that he would fly to South Carolina to discuss general business issues and also Realty Funding. In a friendly email, Scott confirmed that Hochberg would stay at her house during that trip. She then asked for checks from Really Funding for two quarters. Hochberg confirmed that he would bring one check, but that the third quarter payment would not be available until October 31, 2006. By November 7, 2006, the third quarter check had not arrived. Scott, through her assistant, inquired of Hochberg by email. Hochberg deferred. On January 13, 2007, Scott informed Kunes, Alibrandi and Lind that she had still not received from Hochberg the requested paperwork concerning Realty Funding or the third quarter check. She indicated that she would be meeting with Hochberg in the upcoming week and that he would bring the third quarter check and the documentation.
On January 19, 2007, Hochberg provided Scott with a membership certificate dated November 28, 2005, in the name of Robert K. Scott Trust for 250 shares of “Realty Funding, LLC.” The certificate indicated that Really Funding, LLC was organized under the laws of Massachusetts. The certificate was signed by-Hochberg, dated September 12, 2006. Scott also received a check for the third quarter distribution. In March 2007, Scott, in a friendly email to Hochberg, indicated she was setting up a meeting regarding some other business possibility, and also inquired about the Realty Funding check for the fourth quarter of 2006. Hochberg promised to bring the check at the time of the meeting.
On March 14, 2007, Alibrandi informed Scott, in response to her inquiry, that the initial $250,000 was wired to “Steve Hochberg DBA Realty Funding.” In an email to her lawyer (Kunes) on March 25, 2007, Scott expressed that her advisors, Alibrandi and Lind, were “uncomfortable” with the Realty Funding investment because of the lack of paperwork and that she was tired of chasing late quarterly payments. She indicated she was going to talk to Hochberg about pulling out of the investment. Nevertheless, she stated that “I do trust Steve.”
On April 4, 2007, Hochberg sent Scott a 2006 Schedule K-1 tax statement for Really Funding. Scott’s accountant, Lind, immediately identified several deficiencies with the document. Hochberg provided inadequate explanations for these deficiencies, increasing the unease of Scott and her advisors. In May 2007, Hochberg sent additional documentation to Scott, including a purported 2006 financial summary for Realty Funding, and a document entitled Amended Schedule I to Operating Agreement of Realty Funding, LLC, dated November 28, 2005 (i.e., the date of the Scott’s investment in Realiy Funding).[3] Hochberg represented that the operating agreement for Realty Funding had been lost and could, not be found.
Later in May 2007, Lind visited the website of the Massachusetts Secretary of State to verify that Realty Funding was registered with the state. Lind was unable to find any record of Really Funding as a registered corporate entity in Massachusetts. Kunes, also, had checked the Massachusetts Secretary of State’s website for Really Funding. He could not find Realty Funding. According to his deposition testimony, Kunes performed his check of the Secretary of State’s website within four weeks, before or after, of May 17, 2007. Kunes informed Scott that he was unable to find that Realty Funding, LLC was registered with the Massachusetts Secretary of State.
On June 13, 2007, Kunes sent an email to Hochberg complaining about the lack of documentation for Realty Funding. He stated “I have avoided discussing any possible legal options with Debbie because I know how highly she thinks of you so may I ask you to uphold her image and get me the documents.” Both Alibrandi and Lind testified in their depositions that at no time in 2007 did they tell Scott that she had been defrauded by Hochberg. On August 15, 2007, however, Kunes sent a demand letter to Hochberg. Kunes stated “I now can only conclude that there is no legal entity known as Realty Funding, LLC ... I conclude that the sale of an interest in Realty Funding, LLC is the sale of an unregistered security . . .” Kunes demanded the return of the $250,000 investment with accrued interest.
The Kunes demand letter was sent to Hochberg’s business address at Mage. Mage, Davis and Freedman *66 state that this letter from Kunes was their first notice of a purported entity called Realty Funding, LLC. Freedman, however, knew in June 2007 that a CEO of a client had invested in “some sort of real estate entity” with Hochberg and that Hochberg had defaulted on paying the CEO back. Davis, also, learned in June 2007 that two Mage clients had invested in “some sort of real estate investment” with Hochberg. The first time that Scott discussed Really Funding with either Davis or Freedman was after the August 15, 2007 demand letter.
V. Events After the Termination of Hochberg’s Employment
After terminating Hochberg from employment at Mage on August 17, 2007, Mage, Davis, and Freedman filed a lawsuit against him in September 2007. In February 2008, Hochberg filed for Chapter 7 bankruptcy protection in U.S. Bankruptcy Court. On February 8, 2008, Scott, through her Massachusetts counsel, sent a formal Chapter 93A demand letter to Hochberg, only. In May 2008, the United States Attorney filed a criminal information against Hochberg in U.S. District Court, District of Massachusetts. The information alleged a fraudulent scheme by Hochberg of soliciting money for an investment called Realty Funding. Hochberg pleaded guilty in this action on October 16, 2008. He was sentenced to 63 months of imprisonment, three years of supervised release, and ordered to pay $1,731,500 in restitution.
In November 2008, Scott filed suit against Hochberg in Middlesex Superior Court. The Superior Court entered a default judgment against Hochberg, awarding $750,000 in damages to Scott, along with more than $8,465.83 in prejudgment interest, and costs and attorneys fees of $25,698.22.
On August 13, 2010, Scott filed the present action against Mage, Davis, and Freedman.
VI. Scott’s Federal Tax Returns
In August 2007, Scott filed a federal estate tax return for the estate of Robert Scott. The return listed the $250,000 investment in Realty Funding on Schedule G — Transfers During Decedent’s Life, as “Robert K. Scott Revocable Trust Agreement.”
Scott filed her 2008 federal income tax return in October 2009. In that return, Scott relied upon Revenue Procedure 2009-20 to claim a deduction arising from the investment in Realty Funding. In particular, Scott claimed 95% of the “qualified investment” in Realty Funding as a deductible loss available to an investor “with no potential third-parly recovery.” If Scott was an investor with potential third-party recoveiy, she could deduct only 75% of the loss. In order to claim the 95% deduction, Scott declared under the penalties of perjury, that “I have not pursued and do not intend to pursue any potential third-party recovery as that term is defined in §4.10 of Rev. Proc. 2009-20.” As a result of taking the 95% deduction, Scott obtained a refund in the amount of $58,514.
DISCUSSION I. Standard
Summary judgment is appropriate where there are no genuine issues of material fact and the moving parly is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Cassesso v. Commissioner of Corr., 390 Mass. 419, 422 (1983). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue and that the summary judgment record entitles the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence negating an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of its case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991). Once the moving party establishes the absence of a triable issue, the party opposing the motion must respond with evidence of specific facts establishing the existence of a genuine dispute. Pederson, 404 Mass. at 17. An adverse party cannot defeat a motion for summary judgment merely by resting on its pleadings and assertions of disputed facts, rather it must set forth specific facts with affidavits, deposition testimony, answers to interrogatories, or admissions on file showing that there is a genuine issue for trial. Mass.R.Civ.R 56(c). When deciding a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party, but does not weigh evidence, assess credibility, or find facts. Attorney Gen v. Bailey, 386 Mass. 367, 370-71 (1982).
II. Arguments by Defendants for Summary Judgment
Defendants assert two threshold arguments that they contend bar all of Scott’s claims. The two arguments are estoppel and lack of survival of the claims after Robert Scott’s death. In addition, defendants advance specific arguments for dismissal of each of the counts of Scott’s amended complaint.[4] Those arguments include that all of the claims are barred by the applicable statute of limitations, Hochberg was acting outside the scope of his actual or apparent authority precluding respondeat superior liability, Scott’s negligence claims are barred by the economic loss doctrine and Scott fails to support a claim under G.L.c. 93A or the Massachusetts Uniform Securities Act. Each of defendants’ arguments will be discussed in turn.
A. Estoppel and Waiver
Defendants assert that Scott is estopped from asserting all of her claims in this action by the fact that she represented, under oath, in her 2008 federal income tax return that she did not intend to pursue a third party for her investment loss from Realty Fund- *67 tag. As a result of that representation, Scott received a substantial tax refund. Alternatively, defendants argue that Scott’s representation acts to waive her claims against them.
Pursuant to Revenue Procedure 2009-20 adopted by the Internal Revenue Service, Scott had the choice whether to claim a deduction for 75% of her investment loss as an investor with a potential third-party recoveiy arising from a “fraudulent investment arrangement” or 95% of her investment loss as an investor with no potential third-party recoveiy. Scott elected the 95% deduction. She stated “under penalties of perjury” that “I declare that I have not pursued and do not intend to pursue any potential third-party recoveiy, as that term is defined in §4.10 of Rev. Proc. 2009-20.”[5] Defendants argue that in light of the representation made by Scott, it would be inequitable to allow this action for a third-party recoveiy to proceed. Scott counters with the contention that during the “discoveiy year” of 2008, and when she signed the 2009 tax return, she did not know that she had a viable third-party claim and therefore she had not, in fact, formed an intent to pursue a third-party recovery from defendants.
Both Scott and the defendants cite the Supreme Judicial Court’s decision in Haglund v. Philip Morris, Inc., 446 Mass. 741 (2006), for the underlying principles of estoppel. In Haglund, the Supreme Judicial Court stated that “[q]uasi estoppel precludes a party from subsequently repudiating an action to which he had previously manifested his assent and from which assent he thereby benefitted.” Id. at 754, citing Uccello v. Gold’n Foods, Inc., 325 Mass. 319, 328 (1950). The Court noted that quasi-estoppel is an equitable concept based on principles of conscionability.
Two factors weigh against a finding that Scott’s tax return election acts in an unconscionable manner toward defendants. First, Scott’s representation regarding her 2008-2009 intent to pursue a third-party claim was not relied upon by defendants. It was a representation made to the IRS and is, therefore, subject to whatever the tax laws and regulations require as a result of Scott’s pursuit of this lawsuit. It is a matter between Scott and the IRS, not defendants. Second, when Scott signed the tax return in 2009 and represented whether she intended to pursue a third-party claim “as of the last day of the discoveiy year [2008]” she had not commenced this action. Instead, she had commenced a direct claim against Hochberg in 2008. It was not inconsistent for her to declare a lack of present intent to sue a third party, such as one or more of defendants, based on what she knew then.[6] Accordingly, defendants’ estoppel argument is rejected.
Likewise, defendants’ argument that Scott’s representation in her 2008 tax return was a waiver of her claims fails. The representation, by its terms, was not an intentional waiver of a known right. At most, it was a statement of present intent.
B. Survival of Claims
Another threshold argument raised by defendants concerns whether the death of Robert Scott in 2006 extinguished any tort-based claim against defendants. Defendants contend that Counts I, III, V and VI should be dismissed on this basis. They argue that the claims sounding in tort are not the kind enumerated in G.L.c. 228, §1 as surviving the death of the person holding the claims.
Among the flaws in defendants’ argument is the fact that the evidence supports a finding the purchase of the Realty Funding investment was by the Robert K. Scott Revocable Trust, not by Robert Scott, individually. While defendants point to some evidence that the legal holder of the Robert Scott interest in Realty Funding was not formalized until after Robert Scott’s death when Kunes asked that the certificate be issued in the name of the trust, the contrary evidence creates a triable issue of fact, at minimum. There was no death, of course, of the Robert K. Scott Revocable Trust so the question of survival of the claims does not arise if the juiy finds that the trust was the purchaser of the interest in Realty Funding. In any event, even if the ownership of the Realty Funding interest were held by Robert Scott at the time of his death, the claims now asserted may be viewed as “quasi-contractual” in nature and, thus, survive. See Gasior v. Massachusetts Gen. Hosp., 446 Mass. 645, 649 (2006); McStowe v. Bornstein, 377 Mass. 804, 807-08 (1979). Consequently, defendants’ argument based upon lack of survival of the claims is rejected.
C. Statute of Limitations
The principal basis for the motion for summary judgment is that all of Scott’s claims are barred by the applicable statute of limitations. In order to analyze that issue the evidence must be examined to determine what triable issues exist as to the relationships among and between the parties. Scott contends that all three of the defendants owed her a fiduciary duty, the scope of which included disclosing to her, and protecting her from, Hochberg’s untrustworthtaess. Defendants, on the other hand, assert that no fiduciary duty existed. After determining whether a fiduciaiy duty existed, the facts and nature of Scott’s claims must be scrutinized to appraise when the statute of limitations began to run. Applying the test of what a reasonable juiy could find based upon the evidence, and the reasonable inferences therefrom, conclusions may be reached with respect to each defendant and each claim.
I. Fiduciary Duty
“A fiduciary duly exists “when one reposes faith, confidence, and trust in another’s judgment and advice.’ ” Doe v. Harbor Schools., Inc., 446 Mass. 245, 252 (2006) (citations omitted). A fiduciary must “act for the benefit of the other party to the relation as to matters within the scope of the relation.” Id. (citations and *68 internal quotations omitted). “Although some fiduciary relationships .. . are created by law, others arise from the nature of the parties’ interactions.” Id. In the latter situation, “the existence of the relationship ordinarily is a mixed question of law and fact for which the party asserting the relationship bears the burden.” Id. ‘The ‘circumstances which may create a fiduciary relationship are so varied that it would be unwise to attempt the formulation of any comprehensive definition that could be uniformly applied in every case.’ ” Id., citing Warsofsky v. Sherman, 326 Mass. 290, 292 (1950).
a. Hochberg and the Scotts
There is a triable issue of fact with respect to whether a fiduciary relationship existed between Hochberg and both Scott and Robert Scott. While Scott’s post-claim testimony to the effect that she reposed trust and confidence in Hochberg would not be enough standing alone, see Industrial Gen. Corp. v. Sequoia Pac. Sys. Corp., 44 F.3d 40, 44 (1st Cir. 1995) (“the plaintiff alone, by reposing trust and confidence in the defendant, cannot thereby transform a business relationship into one which is fiduciary in nature”), there is sufficient corroboration of the fiduciary relationship coming from both Hochberg and Mage. From the engagement letter at the outset of the relationship, Hochberg promised the individuals (the Scotts) to coach them through the next phase of their lives following the sale of Fabric Editions. Hochberg immediately followed up when the company was sold by assuring the Scotts that his job was not done, “we have a lot of money on the table.” Hochberg developed a close personal and social relationship with the Scotts, a factor that may be considered as evidence of a fiduciary relationship. Patsos v. First Albany Corp., 433 Mass. 323, 335 (2001). Following a dinner together in May 2006, Scott emailed how she and Robert appreciated the guidance Hochberg had provided. It also appears from the record that Hochberg and the Scotts discussed other possible business ventures. Finally, Hochberg utilized his position of trust to encourage the Scotts to invest in Realty Funding without providing them with any prospectus or other documents that typically would be required. A reasonable inference that Hochberg encouraged the Scotts to put their trust and confidence in him with respect to their ongoing financial affairs is fully warranted.
b. Mage and the Scotts
Throughout the entire relationship between Hochberg and the Scotts, Hochberg was acting as CEO of Mage. Through Hochberg’s continuing relationship as an agent, Mage, the principal, is deemed to have the same relationship. Thus, based upon a finding that a fiduciary relationship existed between Hochberg and the Scotts, a fiduciary relationship between Mage and the Scotts also existed. Mage was aware of, and participated in, Hochberg’s ongoing advisory relationship with the Scotts after the sale of Fabric Editions, and with Scott, alone, after the death of Robert Scott. By virtue of Hochberg’s continuing fiduciary relationship up to the time he was fired from Mage, a fiduciary relationship between Mage and Scott existed.
Mage argues that the scope of any fiduciary relationship with the Scotts did not include investment advice. In particular, Mage argues that Hochberg’s solicitation to invest in Realty Funding (a fact unknown to Mage) was outside the scope of Hochberg’s employment duties and beyond his actual or apparent authority from Mage. As a result, Mage contends it cannot be held liable for Hochberg’s fraud on a respondeat superior basis. The foundation of this argument is the November 23, 2005 email from Hochberg to the Scotts where Hochberg made it clear that the investment in Realty Funding had nothing to do with Mage and that Hochberg was running the investment entirely on his own.
The November 23, 2005 email does, in fact, operate to relieve Mage from respondeat superior liability for Hochberg’s fraud. Scott has no evidence to suggest that Mage participated in or authorized Hochberg to solicit the Realty Funding investment. Given the email, Scott had no reasonable basis for believing that the Realty Funding solicitation was a part of Hochberg’s duties at Mage. Unlike in Patsos, supra, there is no evidence that Mage was aware of, or agreed to, Hochberg taking on a general fiduciary duty to make investments on behalf of Scott. Instead, Mage’s respondeat superior liability is determined by the principles set forth in Wang Labs., Inc. v. Business Incentives, Inc., 398 Mass. 854 (1986), and Kansallis Finance, Ltd. v. Fern, 421 Mass. 659 (1996). Wang requires for respondeat superior liability that the employee’s conduct be within the scope of his employment. Conduct is within the scope of employment if it (i) is of the kind he is employed to perform, (ii) occurs substantially within the authorized time and space of employment, and (ill) is motivated at least in part by a purpose to serve the employer. Wang, 398 Mass. at 859. If these three elements are not present, an employer may still have respondeat superior liability if the employee acts with apparent authority of his principal. Kansallis, 421 Mass. at 670. Here, the November 23,2005 email belies either route to respondeat superior liability. As stated in Kansallis, “there is little fairness in saddling the principal with liability for acts that a reasonable third party would not have supposed were taken on the principal’s behalf.” Id. at 665.
Hochberg’s conduct in soliciting the Scotts to invest in a real estate fund run entirely by himself was not in the scope of his employment. Moreover, the conduct was motivated entirely to benefit himself, not Mage. Finally, the November 23, 2005 email makes it impossible for Scott to rely upon apparent authority. This is true notwithstanding Hochberg using his Mage email address when corresponding with the Scotts about the *69 investment. Sheinkopf v. Stone, 927 F.2d 1259, 1269 (1st Cir. 1991) (use of office and letterhead not enough to infer apparent authority), citing Kanavos v. Hancock Bank and Trust Co., 14 Mass.App.Ct. 326, 332 (1982) (‘Trappings of office, e.g., office and furnishings, private secretary ... do not without other evidence provide a basis for finding apparent authority”). Because Hochberg’s conduct in soliciting the Really Funding investment was not within the scope of his employment, Mage cannot be held to be vicariously liable for Hochberg’s fraud.
That said, the question of whether Mage may be held directly liable for breach of fiduciary duty remains vital. As described above, a jury could find that Mage had an ongoing fiduciary relationship with the Scotts from the original engagement until at least the time of the firing of Hochberg. The scope of that fiduciary duty as described by Mage was to provide “comprehensive financial advisory services” to its clients. Mage could be found to have a duty to disclose to its client that Hochberg was untrustworthy when it came to handling money, was living beyond his means, and the client should be wary about investing in any fund that was controlled by Hochberg. The scope of the fiduciary duty could also be found to include protecting a client by properly supervising or firing a rogue employee who Mage has put in contact with the client.
c. Davis and Freedman with the Scotts
The summary judgment record is devoid of evidence to suggest that either Davis or Freedman developed a personal fiduciary relationship with the Scotts. Apparently, Davis helped to establish Mage’s original relationship with the Scotts and then provided some executive coaching to Scott. Freedman is not alleged to have had any business relationship with the Scotts. These contacts are insufficient to form a fiduciary relationship.
In addition, Hochberg was not acting as an agent of Davis or Freedman, in their individual capacities. A fiduciary relationship is not therefore imputed to Davis and Freedman as a result of Hochberg’s relationship. Further, as members or managers of a LLC, they are not liable for the LLC’s breach of fiduciary duty. See G.L.c. 156C, §22.
II. Accrual Date for Causes of Action
In general, a cause of action accrues on the date a person suffers a loss or injury. Here, Scott arguably suffered an injury when the undocumented investment in Realty Funding was first made or, at the latest, when a quarterly distribution check was not timely provided. If the latter date is used, Scott’s claims based upon Hochberg’s fraudulent conduct accrued as early as April 2006. That date would bar Scott’s claim based upon Hochberg’s conduct as being beyond either the three years allowed under G.L.c. 260, §2A for tort claims, or the four years allowed under G.L.c. 260, §5A for violations of G.L.c. 93A, or the four years allowed under the Massachusetts Uniform Securities Act, G.L.c. 110A, §410(e). Scott filed this action on August 13, 2010.
Scott rightly points out, however, that in Massachusetts a “discovery- rule” tolls the date by which a cause of action like those asserted here accrues. Moreover, if the claim is breach of fiduciary duty, the accrual date may be liberalized further to the date the victim “actually knows” of the breach. For both of these tolling doctrines, focus must turn to the conduct being complained of and the causal relationship of that conduct to the injury.
For Scott’s respondeat superior claims, the conduct being complained of is Hochberg’s fraud. For Scott’s direct claims against defendants, the conduct being complained of is the failure by Davis, Freedman and Mage (a) to disclose to the Scotts the facts about Hochberg’s untrustworthiness and warn them about investing with Hochberg, and (b) to protect the Scotts by more closely supervising Hochberg or terminating him from employment.
Under the discovery rule, a cause of action accrues when the plaintiff “discovers, or any earlier date when she should reasonably have discovered, that she has been harmed or may have been harmed by the defendant’s conduct.” Bowen v. Eli Lilly & Co., 408 Mass. 204, 205-06 (1990). “Therefore, the three-year statute of limitations period of §2A does not start to run ‘until a plaintiff has first, an awareness of [his] injuries and, second, an awareness that the defendant caused [his] injuries.’ ” Koe v. Mercer, 450 Mass. 97, 101 (2007), quoting Doe v. Creighton, 439 Mass. 281, 283 (2003). The plaintiff need not know the full extent of her injury for a cause of action to accrue and for the statute of limitations to begin running. Taygeta Corporation v. Varian Assoc., Inc., 436 Mass. 217, 229 (2002). Under the “actual knowledge” standard for a breach of fiduciary duly claim, a cause of action accrues when “the beneficiary [of the fiduciary relationship] has actual knowledge of the fiduciary’s breach.” Lattuca v. Robsham, 442 Mass. 205, 213 (2004). Moreover, “[w]here a fiduciary relationship exists, the failure adequately to disclose the facts that would give rise to knowledge of a cause of action constitutes fraudulent conduct and is equivalent to fraudulent concealment for purposes of applying §12 [of G.L.c. 260] .. . Such a plaintiff need only show that the facts on which the cause of action is based were not disclosed to him by the fiduciary.” Demoulas v. Demoulas Super Markets, Inc., 424 Mass. 501, 519 (1997).
In the previous section of this memorandum, it was concluded that Scott’s claims based upon respondeat superior liability for Hochberg’s fraud fail to survive summary judgment because Hochberg’s conduct was beyond the scope of his employment. Thus, there is no need to determine when Scott “discovered” or had “actual knowledge” of Hochberg’s fraudulent conduct *70 for purposes of a claim for respondeat superior liability.[7] With respect to Scott’s direct claims, however, for negligence, breach of fiduciary duty, and violation of C.93A, the accrual date must be decided.
The summary judgment record contains no evidence suggesting that Scott knew or had reason to know, prior to August 13, 2007 (three years before filing of this action), that the conduct of Davis, Freedman or Mage caused her harm. Her claim is that defendants failed to inform her of information they had regarding Hochberg’s untrustworthiness and to protect her by supervising or firing Hochberg. Nothing in the summary judgment record indicates when Scott became aware of what Davis, Freedman or Mage knew regarding Hochberg’s untrustworthiness but which they did not disclose. A reasonable inference may be drawn that such awareness was long after August 15, 2007, when her lawyer (Kunes) wrote a demand letter to Hochberg at Mage and said nothing about any potential liability of Davis, Freedman or Mage. When she sued Hochberg in 2008, she did not assert claims against Mage, Davis and Freedman The inference is further buttressed by Scott’s statement that she was not aware of facts to support a claim against third parties when she signed her 2008 tax return in October 2009. Finally, because “[i]n most instances, the question when a plaintiff knew or should have known of its cause of action is one of fact that will be decided by the trier of fact” the question of when Scott became aware of the wrongful conduct of Davis, Freedman and Mage should be left to the juiy. Taygeta, 436 Mass. at 229. As a result, Scott’s direct claims against Davis, Freedman and Mage survive a summary judgment challenge based upon the applicable statutes of limitations.[8]
C. Negligent Employment, Supervision and Retention Economic Loss Doctrine
The amended complaint alleges that defendants knew of Hochberg’s improper investment activities and his untrustworthiness but failed to do anything about it. They assert a claim for negligent employment, retention and supervision of Hochberg as well as a claim that defendants negligently failed to inform the Scotts of their knowledge of Hochberg’s financial irregularities and to warn the Scotts not to invest with Hochberg. As described in the previous section, Scott’s claims in this regard survive a challenge based upon the statute of limitations. Defendants next argue that the claims for negligence are barred by the economic loss doctrine. Because Scott’s only alleged loss is the loss of her investment, defendants contend that her claims of negligence are barred.
With respect to Mage, the finding, above, that a triable issue exists as to whether it owed a fiduciary duty to Scott precludes the application of the economic loss doctrine. See Clark v. Rowe, 428 Mass. 339, 342 (1998) (“We have not applied the economic loss rule to claims of negligence by a fiduciary . . .”). With respect to Davis and Freedman who, as described above, did not owe a fiduciary duty to Scott, the issue presented is two-fold: (i) can Davis and Freedman be held liable for negligence, and (ii) if so, does the economic loss rule prevent liability for negligence.
‘To prevail on a claim of negligence, a plaintiff must prove that the defendant owed the plaintiff a duty of reasonable care, that the defendant breached this duty, that damage resulted, and that there was a causal relation between the breach of the duty and the damage.” Lev v. Beverly Enterprises-Massachusetts, Inc., 457 Mass. 234, 239-40 (2010), quoting Jupin v. Kask, 447 Mass. 141, 146 (2006). Whether a party owes another a duty of care is usually a question of law for the court to decide. Id.
In general, “there is no duty to control another person’s conduct to prevent that person from causing harm to a third party.” Lev, 457 Mass. at 246. Nevertheless, a duty to protect another from harm is recognized “where a special relationship exists between the person posing the risk and the one who can prevent the harm.” Id. at 242. This special relationship is found in the employment context when “the employment facilitates the employee’s causing harm to third parties.” Id. at 244 (citation omitted). “An employer must use due care to avoid the selection or retention of an employee whom he knows or should know is a person unworthy, by habits or temperament, or nature, to deal with the persons invited to the premises of the employer.” Foster v. The Loft, Inc., 26 Mass.App.Ct. 289, 290-91 (1988). Such liability of the employer is entirely independent of the employer’s liability under the principles of respondeat superior. Id. at 291, n.4.
While Davis and Freedman were not technically the “employer” of Hochberg, there is evidence in the record sufficient for a jury to find that they, as two of the three co-owners and officers of Mage, accepted a duty to exercise control over Hochberg so as to protect their clients. That they understood their power and duty of supervision is evidenced by their August 2007 demand to Hochberg to provide fall disclosure of the clients of Mage who had been solicited by Hochberg to invest with him. When he did not respond, Davis and Freedman fired Hochberg. Going back to 2005, Davis had directed Hochberg not to be involved in any way with clients outside the normal business activity of Mage. Even earlier, in 2001-2002, Davis and Freedman removed Hochberg as a signatory on Mage’s bank accounts. “Foremost among the considerations in ascertaining the existence of a special relationship that would give rise to a duty of care is ‘whether a defendant reasonably could foresee that he would be expected to take affirmative action to protect the plaintiff and could anticipate harm to the plaintiff from the failure to do so.’ ” Lev, 457 Mass. at 243, quoting Irwin v. Ware, 392 Mass. 745, 756 (1984). Given the ongoing relationship between Mage and Scott for Mage *71 to provide “comprehensive financial advisory services” (as described on Mage’s website) after the sale of Fabric Editions, and given the knowledge of Davis and Freedman that Hochberg was using Mage’s facilities to solicit clients of Mage for investments not controlled by Mage, Davis and Freedman could reasonably foresee that it was up to them to protect Mage’s clients, including Scott, from Hochberg. Thus, a duty of care to prevent harm to clients of Mage must be imposed on Davis and Freedman, individually.
Potential negligence liability of Davis and Freedman cannot be based merely upon their positions as corporate officers. Lieberman v. Powers, 70 Mass.App.Ct. 238, 242 n.6 (2007). It must be found that they participated in acts causing injury to Scott. As described above, Davis and Freedman were directly involved in the supervision of Hochberg. Scott’s negligence claim against Davis and Freedman is based on their failure reasonably to supervise and or to terminate Hochberg as an officer and employee of Mage when they had personal knowledge of his untrustworthiness. A jury question is presented whether their supervision, or lack thereof, caused harm to Scott.
Having determined that Davis and Freedman owed a duty of care to Scott and, thus, could be found liable for negligence by a jury, it must be decided whether the economic loss doctrine bars Scott’s negligence claim. Massachusetts law recognizes generally the economic loss doctrine to prevent recovery for negligence unless the plaintiff can establish that the injury suffered due to defendants’ negligence involved physical harm or property damage, and not solely economic loss. Cumis Ins. Soc., Inc. v. BJ’s Wholesale Club, Inc., 455 Mass. 458, 469 (2009). There are exceptions, however, to the application of the doctrine. The doctrine does not apply to a claim for negligent misrepresentation, Id. at 472 n.22. The doctrine also does not apply when the claim is negligent breach of contractual duties. Brown v. Quest Diagnostics, LLC, 2008 U.S. Dist. LEXIS 101678 at *8 (D.Mass. 2008). Finally, in a venerable case from 1902, the Supreme Judicial Court did not apply the doctrine to prevent a plaintiff from recovering economic loss (damages for loss of property) caused by negligent failure to supervise an employee who absconded with plaintiffs property. Carson v. Canning, 180 Mass. 461, 462 (1902). See also HR Knowledge, Inc. v. Professional Ins. & Risk Brokerage, LLC, 2008 Mass.App. Unpub. LEXIS 773 at *3 n.5 (noting that a negligent hiring or retention claim could have been asserted by plaintiff seeking recovery for economic loss).
Defendants cite no Massachusetts authority applying the economic loss doctrine to a claim for negligent supervision. Like Carson, supra, Scott’s negligent supervision claim involves property loss as a result of a rogue employee, put in place by the defendant, absconding with the property. In addition, Scott’s claim arises, indirectly, from Scott’s contract with Mage. That contract, in the form of the original engagement, promised coaching to Scott through the next phase of her life. The contract, in the form of the implicit agreement to provide services after Fabric Editions was sold, included the comprehensive financial advisory services touted by Mage’s website. The contract created a duty on the part of Mage as well as its principals to perform the contract non-negligently. One manner of negligent performance of the contract would be negligent supervision by Davis and Freedman of their fellow officer and principal. Scott’s claim seeks to hold liable the two principals in a small firm who allegedly allowed, with direct knowledge, an untrustworthy business partner to continue to deal with the financial affairs of a client to benefit the firm and, indirectly themselves, without properly supervising their third business partner. In substance, there was an implicit misrepresentation by Davis and Freedman that their business partner, Hochberg, was worthy of their clients’ trust. These facts do not fit into the policy rationale for the economic loss doctrine which acts to limit negligence liability for unforeseeable losses. Consequently, defendants’ motion for summary judgment on the negligence claims will be denied.
D. G.L.C. 93A
Beyond the arguments by defendants already disposed of (statute of limitations, estoppel, survival), defendants raise two additional arguments for dismissal of Scott’s G.L.c. 93A claim. First, they posit that there was no business relationship with Scott, personally, although they concede they had a business relationship with Fabric Editions. Second, they contend that the actions complained of do not rise to the level of unfair and deceptive acts prohibited by c. 93A.
The first argument may be easily dismissed. There is sufficient evidence for a fact finder to conclude that there was a business relationship between Mage and Scott. This was true before the sale of Fabric Editions and certainly after the sale. From the engagement letter in 2002 to the assistance with the earn out provisions following the sale of Fabric Editions, the Scotts were clients of Mage. As officers and principals of Mage, Davis and Freedman are held to have a business relationship with Scott.
The second argument presents a closer question although the more prudent course is to allow the trial judge to decide after he or she has heard all of the evidence. The misconduct complained of sounds mostly in negligence, although Mage is also being held for trial on a breach of fiduciaiy duty claim. A breach of fiduciary duty is “within at least the penumbra of some . . . statutoiy or other established concept of unfairness” as is required under c. 93A, §2. See Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass. 760, 778 (1986), internal citations omitted. Mere negligence is not usually a violation of c. 93A. Scott contends, however, that the failure of defendants to warn Scott about Hochberg even after they had *72 removed Hochberg as a signatory to Mage’s bank accounts (arguably to protect themselves), and to allow Hochberg, improperly supervised, to deal with Scott’s financial affairs, was unfair and deceptive. At this stage, indulging all inferences in favor of Scott, the c.93A claim cannot be dismissed on summary judgment.
E. G.L.c. 110A
General Laws c. 110A, §410(b), the Massachusetts Uniform Securities Act (“MUSA”), provides:
(b) Every person who directly or indirectly controls a seller liable under subsection (a), every partner, officer, or director of such seller, every person occupying a similar status or performing similar functions . . . are also liable jointly and severally and to the same extent as the seller, unless the non-seller who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.
Scott alleges that Hochberg was a “seller” and Mage, Davis and Freedman were “control persons” under this statute.
As described above, Mage did not sell and was not involved in the sale of Realty Funding shares. It is beyond dispute that Hochberg sold the Realty Funding interest separately from Mage and explicitly represented as much to the Scotts. Thus, Davis and Freedman are not control persons merely because they are officers of Mage. In addition, the record establishes that Mage, Davis and Freedman were not aware of Hochberg’s sale of Realty Funding to the Scotts. Accordingly, the only issue is whether defendants controlled the seller, Hochberg, “directly or indirectly” with respect to his illegal activity of selling unregistered interests in Realty Funding. Scott contends that the ability of defendants to supervise and discipline Hochberg generally in his capacity as officer/principal of Mage is enough. Her contention fails.
Section 410 of MUSA is modeled after §12(a)(2) of the federal Securities Act of 1933. Therefore, courts have interpreted MUSA in conformity with the federal act. Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 50 (2004). For control person liability to be imposed under the federal statute, the control person must be shown to actively participate in the decision making process of the illegal seller of securities. Aldridge v. A.T. Cross Corp., 284 F.3d 72, 85 (2002). As described by the court in Sheinkopfv. Stone, 927 F.2d 1259 (1991), where there was evidence that a partner in a law firm was an illegal “seller” of securities under both the federal act and MUSA, but that his law partners were unaware of the sale and did not participate therein, the law partners could not be control persons under the act because there was no evidence “that the firm exercised, directly or indirectly, meaningful hegemony over the [selling entity] through [the selling partner] or otherwise.” Id. at 1270. Likewise, there is no evidence in this case that Mage, Davis or Freedman exercised any control over Hochberg with respect to Really Funding. Summary judgment is appropriate to dismiss Scott’s claim under the MUSA.
ORDER
For the reasons stated above, defendants’ motion for summary judgment is ALLOWED in part and DENIED in part. The motion is ALLOWED with respect to Counts III and VI asserting liability of defendants on a respondeat superior basis for Hochberg’s fraudulent activity. The motion is ALLOWED with respect to Count II, breach of fiduciary duty, in favor of defendants Jeffrey Davis and Jonathan Freedman. The motion is ALLOWED with respect to Count IV, alleged violation of the Massachusetts Uniform Securities Act. The motion is DENIED in all other respects.

This Amended Schedule indicated that Realty Funding had eleven members, including Hochberg, and that the capital account totaled $8,600,000. The Scotts’ interest was listed under the name Robert Scott.

The Amended Complaint asserts six counts: Count I (Negligence), Count II (Breach of Fiduciary Duty), Count III (Respondeat Superior), Count IV (Violation of the Massachusetts Uniform Securities Act, G.L.c. 110A), CountV (Violation ofG.L.c. 93A) and Count VI (Respondeat Superior for violation of c. 93A).

Section 4.10 of Revenue Procedure 2009-20 defines “potential third-party recovery” as “the amount of all actual or potential claims for recovery for a qualified loss, as of the last day of the discovery year, that are not described in section 4.08 [Potential Insurance/SIPC Recovery] or 4.09 [Potential Direct Recovery].” The “discovery year” is defined in Section 4.04 as “the taxable year of the investor in which the indictment, information or complaint described in section 4.02 of this revenue procedure is filed."

The cases from other jurisdictions cited by defendants for application of the doctrine of quasi-estoppel are distinguishable on this basis. In the cases cited by defendants, ataxpayer took an unequivocal position in a tax return that was inconsistent with a subsequent position taken in litigation. Here, Scott’s statement in her tax return was a statement of present intent rather than an unequivocal statement of fact.

Suffice it to say, however, it is clear beyond reasonable dispute that Scott knew or should have known that she suffered harm with respect to her investment in Really Funding by Hochberg’s conduct by May 2007. By that time, Scott had received an ownership certificate in Realty Funding, LLC that indicated it was a Massachusetts LLC. In May 2007, Scott’s lawyer and her accountant confirmed with the Massachusetts Secretaiy of State that no such entity was registered in Massachusetts. In addition, quarterly distributions had been late or non-existent for the last quarter. Scott had made up her mind to get out of the investment. Thus, a tort claim for respondeat superior liability based on Hochberg’s fraud would be barred by the three-year statute of limitations.

Scott’s claim against Mage for breach of fiduciary duty survives also because the accrual is governed by the “actual knowledge” standard. Scott would be able to show that defendants did not disclose to her what they knew about Hochberg prior to August 13, 2007 (three years before the filing of this action).